**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-23-81-JFH |
| | ) | |
| **JAMES STEVEN PEAVLER,** | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS THE**

**INDICTMENT FOR FAILURE TO STATE AN OFFENSE**

The Defendant, James Steven Peavler, through undersigned counsel, William Widell and Angela Bonilla, and pursuant to Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure, submits this Motion to Dismiss the indictment for failing to state an offense because the charged offense is based on an unconstitutional statute.[1] In support of such motion, Defendant states as follows:

**Facts of Case**

On June 29, 2022, Mr. Peavler entered Checotah Firearms, a federal firearms licensee (FFL), to purchase two rifles. Before he could purchase the firearms, he was required to completed ATF form 4473.

---

[1] A defendant can move before trial to dismiss an indictment for failure to state an offense, Fed. R. Crim. P. 12(b)(3)(B). A defendant can move to dismiss for failure to state an offense on the basis that the charged offense is based on an unconstitutional statute. *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973); *United States v. Stone*, 394 F. Supp. 3d 1, 8 (D.D.C. 2019). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

On that form, Mr. Peavler denied being under indictment or information for any felony offense. However, on April 11, 2022, Mr. Peavler was charged by way of information with the following felony offenses in case number CF-22-47 in McIntosh County, state of Oklahoma: distribution of controlled dangerous substance and bringing contraband into a jail.  These charges were still pending at the time he filled out the ATF form 4473. On May 10, 2023, Defendant was charged with making False Statement to Firearms Dealer in violation of Title 18 U.S.C. §922(a)(6).

The elements of a violation of §922(a)(6)are as follows:

1. The defendant made a false statement while obtaining a firearm from a licensed dealer;

2. The defendant knew the statement was false; and

3. The statement was intended to or was likely to deceive about a material fact, i.e., one which would affect the legality of the transfer of the firearm from the dealer to the defendant.

**LEGAL ARGUMENT**

The Second Amendment provides that "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

To evaluate a Second Amendment challenge to a firearms regulation, Courts use the *Bruen* framework. *New York State Rifle v. Bruen*, 142 S.Ct. 2111, 213 L.Ed.2nd 387 (2022). "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.[2]

---

[2] By "consistent with the historical tradition," we mean that the Second Amendment protects rights that are "enshrined with the scope they were understood to have  when the people adopted them." *Bruen*, at 2136 (citing *District of Columbia v. Heller*, 554 U.S. 570, 634-35, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." Id. at 2129-30.

I.      **Step One Under *Bruen:* Is Receiving a Firearm Covered by the Plain Text?**

The threshold question is whether Mr. Peavler's conduct, attempting to obtain a firearm, is covered by the plain text of the Second Amendment? Although the plain text of the amendment refers to the people, the rights protected by the Second Amendment aren't solely collective rights relating to militia service but are also individual rights. *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). And, while the right to keep and bear arms implies a right to possession, the Second Amendment protects not only possession of firearms but also, the necessary precursor to possession, acquisition of firearms. *See United States v. Holden*, No. 22-CR-30-RLM-MGG2022, ---F.Supp.3d ---2022 WL 17103509 (N.D. Indiana South Bend Div. October 31, 2022)(receiving a firearm is necessarily a precursor to keeping or bearing a firearm, so Mr. Holden's conduct is presumptively protected by the Second Amendment); *United States v. Quiroz*, No. PE: 22-CR-00104-DC, ---F.Supp.3d---, 2022 WL 4352482, at *3-4 (W.D. Tex. Sept. 19 2022)(holding that "to keep and bear arms" includes receiving arms); *United States v. Kays*, No. CR-22-40-D, ---F.Supp.3d, 2022 WL 3718519, at *2-3 (W.D. Okla. Aug 29, 2022). While these cases are only of persuasive value, it seems reasonable to conclude that a regulation that prevents acquisition of firearms infringes on the right to bear them.

Because Mr. Peavler's conduct, acquiring a firearm, appears to have been covered by the plain text of the Second Amendment, the Constitution presumptively protects his conduct. The question of §922(a)(6)'s constitutionality now turns on whether prohibiting persons under

information or indictment from receiving a firearm is consistent with the Nation's historical tradition of firearm regulation.

## II.        Step Two Under *Bruen:* Historical Analysis

To determine whether a challenged regulation is part of the "historical tradition," the court should first consider whether the challenged regulation addresses an issue that would have existed at the time of ratification.[3]  If the issue existed, then "the lack of a distinctively similar historical regulation addressing the problem" suggests the regulation is unconstitutional. *Bruen* at 2131.

Section 922(a)(6) addresses an issue which would have existed at the time of ratification, i.e., whether persons under indictment should be allowed to acquire firearms. The text of the Fifth Amendment, also ratified in 1791, provides that prosecutions "for capital, or otherwise infamous crime" must be instituted by "a presentment or indictment of a Grand Jury." Whether a crime is "infamous" depends on its punishment rather than the nature of the act. Courts have ruled that any crime that may be punished by more than one year imprisonment in a penitentiary is an infamous crime. See *Green v. United States*, 365 U.S. 165, 183 (1958); *Mackin v. United States*, 117 U.S. 348, 350-52 (1886). Today, we more commonly describe crimes punishable for more than one year as felonies.

---

[3] Recall that *Heller* and *Bruen* instructed that the scope of the Second Amendment is defined by the understanding of the right by the people who adopted it. *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138, at *12 (W.D. Okla. Feb. 3, 2023).

In 1791, citizens faced indictment for felony offenses and the government faced the self-same issue of whether and how to regulate firearm acquisition by citizens charged by indictment. Given that the same issue existed at the time of ratification, the next question in *Bruen's* analytical framework is whether there was any contemporaneous regulation intended to deal with the issue.

The text of the Second Amendment itself, and its lack of restriction, suggests that its drafters were loathe to disarm any citizen; likely because English law had a long history of disarming citizens without regard for due process. *Quiroz* at *6, (citing Robert H. Churchill, *Gun Regulation, the Police Power and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST.REV. 139, 155 (2007)). The *Quiroz* court noted that "even while still under English rule, the colonies' attitude toward disarming individuals diverged from its English roots. *Id*. Indeed, when Virginia disarmed all citizens who refused to take an allegiance test, it did so only partially, allowing citizens to keep 'such necessary weapons as shall be allowed him by order of the justices of the peace at their court, for the defense of his house and person.'" *Quiroz* at *6, (citing, I George I, stat. 2, c. 13 (1714); and "*An Act for Disarming Papists and Reputed Papists, refusing to take oaths to the government*," (1756)); Hening, Statutes at Large, 7:35.

Leading up to ratification of the Second Amendment, the *Quiroz* court found that the colonies, "consistently refrained from exercising such power over citizens". *Id*. (citing Robert H. Churchill, *Gun Regulation, the Police Power and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST.REV. 139, 157 (2007)). In fact, at least one historian reported that despite searching all printed session laws of the first fourteen states from

1607 to 1815, he could not find "a single instance in which these jurisdictions exercised a police power to prohibit gun ownership by members of the body politic." *Id*. (citing Robert H. Churchill, *Gun Regulation, the Police Power and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST.REV. 139, 142 (2007)).

Even after ratification and leading up to the Federal Firearms Act (FFA) of 1938, "prohibiting possession of firearms, even by those convicted of violent felonies was a rare occurrence." *Quiroz* at *6. It would be almost a hundred years after ratification before the supreme court of Missouri ruled on a firearm regulation that regulated "the condition of a person—rather than directly regulating the manner of carrying." *Id*. (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L & PUB. POL'Y 695, 711 (2009)). In that case, the court upheld a ban on possession of a deadly weapon while intoxicated. *Id*. (citing *Missouri v. Shelby*, 90 MO 302, 2 S.W. 468 (1886)).

And while other early courts would continue to regulate the condition of persons possessing weapons, few states prohibited any class of person from possessing firearms. *Quiroz* at *7. By the 1920s, only six states had laws barring the carrying of concealed weapons[4] and no state banned possession of long rifles. *Id*. (citing C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L & PUB. POL'Y 695, 708 (2009)).

Title 18 U.S.C. §922(a)(6) regulates conduct protected by the Second Amendment. This creates a presumption that the regulation is unconstitutional. To overcome that presumption,

---

[4] The ban on carrying concealed weapons only applied to those persons who had already been convicted of a crime committed with a concealed weapon. C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L & PUB. POL'Y 695, 711 (2009).

the government must demonstrate a historical justification for disarming persons charged by indictment or information but not yet convicted. Even though the same issue existed at the time the Second Amendment was adopted—whether to allow persons charged but not convicted of felony offenses to acquire firearms—the ratification-era government chose not to regulate such conduct, suggesting a strong preference for Second Amendment rights over competing concerns. Section 922(a)(6) is unconstitutional under the *Bruen* framework and the indictment in this case must be dismissed.[5]

### III.   Section 922(a)(6) Violated Defendant's Right to Due Process Under the 5th Amendment.

The Fifth Amendment provides, "[n]o person shall ... be deprived of life, liberty, or property, without due process of the law." U.S. Const. amend. V. To state a due process claim, two elements must be alleged: (1) that a recognized liberty or property interest has been interfered with, and (2) that the procedures attendant to that deprivation were not constitutionally sufficient. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The Second Amendment protects the right of "the people" to keep and bear arms.  That right is exercised individually and belongs to all Americans.[6]  Mr.

---

[5] Section 922(a)(6) only prohibits statements intended to or likely to deceive about a material fact made in connection with the acquisition of a firearm. 10th Cir. Pattern Jury Instruction 2.42. A material fact is one "which would affect the legality of the transfer of the firearm from the dealer to the defendant." *Id*. Because §922(a)(6) violates the second Amendment, the question of whether Mr. Peavler was under indictment would have no impact on the lawfulness of the firearm transfer. *Holden* at *6-7.

[6] In *District of Columbia v. Heller*, the Supreme Court explained that the phrase "the people" in the Second Amendment has been interpreted throughout the Constitution to "unambiguously refer[] to all members of the political community, not an unspecified subset." *Heller* at 554 U.S. at 580, 128 S.Ct. 2783. "The people," according to Heller are "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. (citing *United*

Peavler is included in "the people" and thus possesses a recognized interest in both obtaining and possessing firearms.[7] Section 922(a)(6) deprived Mr. Peavler of the right to acquire a firearm, upon the filing of a felony information, absent sufficient procedure.

Upon a showing that the government has interfered with a protected interest, courts should considers three factors in determining the level of process due: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

A particularly troubling aspect of §922(a)(6) is that, unlike §922(g) which strips rights only after adversarial proceeding and conviction, it strips Second Amendment rights, not from persons convicted of criminal conduct, but from persons presumed to be innocent of such conduct. The statute does not narrowly target persons by restricting acquisition based upon the type of crime for which one is presumed innocent, i.e., violent/non-violent, nor does it require that the charge be supported by probable cause or any other quantum of proof. An information, the charging document at issue in the instant case, does not require a probable cause filing, nor does it require any hearing be held, adversarial or otherwise. It provides no mechanism for disputing the

---

*States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). This creates the basis for the *Heller* Court's opinion.

[7] "In sum, we reject the government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment." *Range v. Attorney General United States of America*, ---F.4th--- 2023 WL 3833404 (3rd Cir 2023).

restriction. It is simply an absolute restriction on firearms acquisition for all persons merely accused of criminal conduct.

Of grave concern is that state-court criminal defendants may remain under information for years on end. Given that §922(a)(6) affords zero procedural safeguards before stripping Second Amendment rights, the risk of erroneous deprivation is significant.  The government's burden, on the other hand, is minimal. Each person subject to §922(a)(6)'s restrictions, because of the filing of an information, is already entitled to an initial appearance, a bond hearing and a probable-cause hearing. Assuming the government, in a particular case, believed there was a need to restrict further firearms acquisition, the government could simply put forth evidence as to the need to restrict further acquisition. The defendant, through counsel retained or appointed, could present evidence in opposition.  Like detention hearings, the government might decide not to move forward with a request to strip Second Amendment rights and many defendants would likely waive the hearing. Given that a case is already open and hearings already set, providing procedural safeguards would not create undue burden on the government and would assure that persons subject to §922(a)(6) had notice and opportunity to be heard.

Mr. Peavler was deprived of his right to acquire and possess firearms with no process whatsoever. The risk of erroneous deprivation could not be greater. Procedural safeguards would reduce the chance of erroneous deprivation without significant burden to courts or government.

### Conclusion

Section 922(a)(6) burdens activity protected by the Second Amendment. Mr. Pevley, the person being regulated, belongs to the protected political community and the regulation is not consistent with the history and tradition of firearm regulation as understood by the people who

adopted the Second Amendment. Under the *Bruen* standard, §922(a)(6) is therefore unconstitutional. Further, §922(a)(6) deprives Second Amendment rights from protected persons without sufficient due process.

Respectfully submitted,

OFFICE OF THE FEDERAL PUBLIC DEFENDER
Scott Graham, Federal Public Defender

By:       s/William Widell
          William Widell, OBA #18313
          Assistant Federal Public Defender
          112 N. 7th Street
          Muskogee, Oklahoma 74401
          Telephone: (918) 687-2430
          Facsimile: (918) 687-2392
          E-mail: william_widell@fd.org
          *Counsel for the Defendant*

## CERTIFICATE OF SERVICE

I certify that on the 20th day of June 2023, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant(s):

Edith Singer
Assistant United States Attorney
Office of the United States Attorney

s/William Widell
William Widell